In re Kenneth/Jeannine
JARVIS, Debtors.

Kenneth/Jeannine Jarvis, Plaintiffs,

v.

Wells Fargo Financial, et al

v.

KJA Jarvis Swine, Defendant.

No. 03–3234.

United States Bankruptcy Court,
N.D. Ohio.

Jan. 15, 2004.

Steven L. Diller, Van Wert, OH, for plaintiffs.

John F. Kostyo, Findlay, OH, for First Natl Bank of Pandora.

Earl J. Rice, Van Wert, OH, for KJA Jarvis Swine, LLC.

## MEMORANDUM OPINION AND DECISION

RICHARD L. SPEER, Bankruptcy Judge.

This cause comes before the Court after a Trial on three separate, but related pleadings: the Plaintiffs/Debtors' Complaint for Declaratory Judgment and for Violation of Stay; a Crossclaim filed by the Defendant, the First National Bank of Pandora, against Wells Fargo Financial Leasing, Inc., Assignee of Telmark, LLC; and a Third–Party Complaint filed by the First National Bank of Pandora against KJA Jarvis Swine, LLC. With the exception of Jarvis Swine, all of the Parties with an interest in this matter were represented by legal counsel.

At the Trial, the Parties stipulated that the Plaintiffs' Complaint for Violation of Stay had been resolved. As it concerns their Complaint for Declaratory Judgment, the Debtors seek a determination as to the validity and relative priority of competing claims in certain property utilized by the Debtors in the operation of their business so as to enable them to properly formulate a plan of reorganization. The resulting Crossclaim and third-party complaint filed by Pandora Bank raise, for all practical purposes, this exact same matter. In addressing this matter, the Court, so as to simplify matters in the ensuing discussion, will refer to the Parties as follows:

the Plaintiffs/Debtors, Kenneth and Jeannine Jarvis will be referred to collectively as the "Debtors;"

the Defendant, Third–Party Plaintiff and Cross–Claimant, the First National Bank of Pandora, will be referred to as the "Pandora Bank;"

the Defendant and Cross–Defendant, Wells Fargo Financial Leasing, Inc., Assignee of Telmark, LLC, will be referred to as "Wells Fargo;"

the Third–Party Defendant, KJA Jarvis Swine, LLC, will be referred to as "Jarvis Swine;" and

the Defendant, Telmark, LLC, will be referred to as "Telmark."

## FACTS

With respect to the matter raised in the Parties' pleadings, these facts are not in dispute. The Debtors operate a hog raising business. As a part of their business operations, the Debtors own a parcel of real property, approximately three acres in size. (Plaintiffs' Ex. No. 3). On September 20, 2000, the Debtors executed in favor of Pandora Bank, two open-end mortgages on their real property as security for Pandora Bank making, under two separate promissory notes, loans totaling $242,800.00. On October 12, 2000, these mortgages were duly recorded under Ohio law so as to make them effective against any subsequent bona fide purchaser. *See* O.R.C. § 5301.23 and § 5301.25.

As a part of their hog operation, the Debtors formed a Limited Liability Company known as Jarvis Swine. The sole members of Jarvis Swine were the Debtors, and the Debtors' daughter, Allison Hiser. Jarvis Swine, however, had no interest in the real property the Debtors utilized in their hog operation; nor was Jarvis Swine, as a business entity, ever used in the day-to-day operations of the Debtors' hog business. In this regard, the evidence shows that Jarvis Swine was nev-

er adequately capitalized to functionally operate as business entity.

However, despite the lack of adequate capitalization, the Debtors, in order to expand their hog operation, caused Jarvis Swine to enter a lease agreement with Telmark, the basis of which was to have Telmark finance the construction of two primary structures: (1) a 20–crate farrowing building; and (2) a 60′ × 32′ addition to a hog gestation building which included reroofing the existing building whose original dimension was 150′ × 32′.[1] Construction on these structures began on or around May 1, 2001, and continued for some time thereafter, with a "sales agreement" concerning construction on the structures being issued as late as December 20, 2001. (T.M. Exs. E & G). The structures themselves are one full story in height, are set in a sturdy concrete foundation, and are hooked up to utilities.

Telmark executed its lease for the construction of the farrowing and gestation buildings on April 17, 2002, with the Debtors and their daughter, Ms. Hiser, signing the lease in their capacity as members of Jarvis Swine. The terms of this lease provided that, commencing May 1, 2002, Jarvis Swine would make 143 consecutive monthly payments to Telmark in the amount of$1,191.00. (Ex. T.M. B). Notably lacking in the lease, was any provision allowing Jarvis Swine or the Debtors to buy the structures at the end of the lease term for a nominal amount. Instead, the lease provided three options at its termination: (1) renewal; (2) purchase of the buildings at a fair market value; or (3) repossession of the structures by the lessor. As it regards the later, the testimony elicited at the Trial revealed that, as with other leases issued by Telmark of a similar

nature, this option is exercised with some regularity.

To protect its lease interest, Telmark filed a UCC financing statement which set forth both the farrowing and gestation buildings as security for the lease; also, set forth therein was a short description of the Debtors' realty. This financing statement, which was filed on October 24, 2001, named as the debtors both Jarvis Swine and the Debtors in their personal capacity. (Ex. T.M. F). Also, as additional security for the lease, the Debtors, in their individual capacity, granted to Telmark a mortgage interest in the improvements financed by Telemark; this mortgage was dated October 10, 2001, and then recorded on October 15, 2001. (Ex. T.M. D). Later, this mortgage was assigned to Wells Fargo, who is the real party defending in the present action, with the notice of the assignment being recorded on March 27, 2003. (Pandora Ex. # 9).

On December 31, 2002, the Debtors filed a petition in this Court for relief, as family farmers, under Chapter 12 of the United States Bankruptcy Code. Prior to filing, Pandora Bank had, through the filing of certificates of judgment, obtained separate liens against the Debtors' property: a lien for $153,029.52 dated December 23, 2002; a lien for $69,569.27 dated December 23, 2002; and a lien solely against Mr. Jarvis' interest in the property for $79,530.74 dated December 10, 2002. On June 30, 2003, the Debtors initiated the instant action seeking a determination as to the status of the respective Defendants' interest in their real property so as to enable them to properly put forth a plan of reorganization.

## DISCUSSION

At issue in this case is the validity and priority of certain liens. Therefore, in ac-

---

1. Jarvis Swine also entered into another lease agreement with Telmark involving equipment

for these buildings. This lease, however, is not at issue in this case. (Ex. T.M. B)

cordance with 28 U.S.C. §§ 157(a)/(b)(2)(K) and 28 U.S.C. § 1334, this is a core proceeding over which this Court has the jurisdictional authority to enter final orders.

Based upon the above facts, Wells Fargo seeks to be treated as a lessor for purposes of 11 U.S.C. § 365. It is Pandora Bank's position, however, that, by virtue of the mortgage liens it holds against the Debtors' real property, its interest in the hog and farrowing structures constructed on this property is superior to that of Wells Fargo, as assignee of Telmark's financing lease. Based thereon, Pandora Bank seeks to be treated, to the detriment of Wells Fargo, as a secured creditor for the value of these structures, thereby entitling it to the benefits afforded by 11 U.S.C. § 1225(a)(5).

■■■ In arguing for the superiority of its mortgage interests, Pandora Bank relies upon a single supposition: both the hog and farrowing structures constructed by Jarvis Swine, and financed by Telmark, are "fixtures" by virtue of their attachment to the Debtors' realty. As with other interests in property, whether an item of property is a fixture and the effect thereof, is determined by reference to applicable state law. *Butner v. United States,* 440 U.S. 48, 54, 99 S.Ct. 914, 59 L.Ed.2d 136 (1979); *In re Shelton,* 35 B.R. 505, 508 (Bankr.E.D.Va.1983). In this case, therefore, since Ohio is the situs of all the property at issue, Ohio's law on fixtures is controlling.

■■■ Under Ohio law a "fixture" is defined as an "article which was a chattel, but which by being physically annexed or affixed to the realty, became accessory to it and part and parcel of it." *Holland Furnace Co. v. Trumbull Sav. & Loan Co.,* 135 Ohio St. 48, 52, 13 O.O. 325, 19 N.E.2d 273, 275 (1939). In line with this definition of a fixture and also in line with Pandora

Bank's position, Ohio law generally provides that an item of personalty that subsequently becomes a fixture takes subject to any previously recorded mortgage covering the realty, even though the mortgaging instrument makes no reference to the fixture. *Id.* In opposition to the applicability of this legal principle, Wells Fargo raised a number of different arguments, the most elemental of which, and the one that will be addressed first, is simply that the farrowing and gestation structures are not actually "fixtures" for purposes of Ohio law.

■■■ In *Teaff v. Hewitt,* the Supreme Court of Ohio set forth the following three-part test to determine whether an item personalty has become a fixture:

(1) Actual annexation to the realty, or something appurtenant thereto;

(2) Appropriation to the use or purpose of that part of the realty with which it is connected;

(3) The intention of the party making the annexation, to make the article a permanent accession to the freehold.

1 Ohio St. 511, 527 (1853). As it pertains to these requirements, much of the evidence presented at the Trial centered on the first element: annexation. At the conclusion of the Trial, however, Wells Fargo, given the clear overwhelming weight of the evidence, conceded to the applicability of this element, thus leaving just the second and third elements of the *"Teaff"* test for this Court to decide.

■■■ As between the second and third requirements of the *Teaff* test, the Supreme Court of Ohio has held that "the intention of the annexing party is of primary importance." *Masheter v. Boehm,* 37 Ohio St.2d 68, 73–74, 66 O.O.2d 183, 185, 307 N.E.2d 533, 538–39 (1974). With respect to the issue of intent, Ohio law looks not simply at the intent to affix a

chattel to a parcel of reality, but beyond, asking whether the affixor, in fact, intended to "devote the chattel to the use and service of the land or structure already a part of the land, in such manner to enhance the serviceability of the whole as a permanent unit of property to whatever use it may be devoted." *Zangerle v. Standard Oil Co. of Ohio,* 144 Ohio St. 506, 519, 60 N.E.2d 52 (1945). Telling in this regard, is any express agreement created between the parties. *Id.* at 539, 60 N.E.2d 52; *Masheter,* 37 Ohio St.2d at 74–75, 307 N.E.2d at 539.

As applied to this case, the evidence presented shows that the lease agreement between Telmark and Jarvis Swine specifically set forth that the farrowing and gestation structures were personal property. In doing so, the lease provided that at its expiration, Telmark, as the lesseer, was entitled to remove the buildings, at the expense of Jarvis Swine, if one of these two conditions was not met: (1) the lease was either not renewed; or (2) the buildings were not purchased for a fair market value. (TM Ex. B). Additional enabling clauses of this lease provided the means by which Telmark could repossess its collateral. *Id.* For example, Telmark was entitled to detach the hog and farrowing structures from any connected utilities. Thus, based upon these provisions of Telmark's lease, the intent of the Parties, at least from a contractual standpoint, was undoubtably to keep the farrowing and gestation structures personal property subject to Telmark's lease.

 Nevertheless, while an agreement between the parties is relevant as to the issue of intent, it is not necessarily dispositive of the issue. Rather, an intent to create a fixture also has an objective component in that for a chattel to be found to be a fixture, it must be affixed to the realty in such a manner that it will indicate to all persons dealing with the realty that it was the intention and purpose of the owner of the chattel to make it a permanent attribute of the realty. *Holland Furnace Co. v. Trumbull Sav. & Loan Co.,* 135 Ohio St. 48, 13 Ohio Op. 325, 19 N.E.2d 273 (1939); *East Ohio Bldg. & Loan Co. v. Holland Furnace Co.,* 48 Ohio App. 545, 194 N.E. 598 (1934). Many different considerations are useful in this regard—for example, the permanent or impermanent nature of the property, the mode of attachment, and the relationship between the parties. *See, e.g., Harbor Island Assn. v. Kaiser,* Ottawa App. No. 93OT022, unreported, 1994 WL 240289 *5 (June 3, 1994).

Of such objective considerations, particular attention is paid to the relationship between the parties—e.g., mortgagor/mortgagee; vendor/vendee; landlord/tenant. In the words of the Ohio Supreme Court, "the same article may be a fixture under certain circumstances and a chattel under others, and that there could be such a difference in the same article as between vendor and vendee, landlord and tenant, heir and executor, or a tenant for life and remainderman." *Roseville Pottery v. County Bd. of Revision of Muskingum Cty.,* 149 Ohio St. 89, 95, 77 N.E.2d 608, 612 (1948). What is particularly important here is whether credit was extended based upon the assumption that the chattel was a fixture.

Looking now at this case, very little concerning the relationship among all of the Parties would suggest that there existed any intent to make the hog farrowing and gestation structures permanent attributes of the Debtors' realty. Of particular importance, Pandora Bank, having lent money to the Debtors prior to the time the farrowing and gestation buildings were constructed, did not extend credit based upon any enhancement in value such structures conferred upon the Debtors' realty.

Also relevant in this regard, the evidence presented shows that, while no specific understanding was reached between the Parties, Pandora Bank was aware that the Debtors were contracting to have structures built on their property; however, Pandora Bank never sought nor obtained any sort of subordination agreement.

Additional objective considerations also do not support the conclusion that the hog and farrowing structures were intended to be permanent attributes of the Debtors' realty. Of particular noteworthiness, the evidence presented shows that, while being firmly attached to the realty, the structures at issue were constructed of light weight materials, similar to that of a mobile home. Also similar to a mobile home, the hog and farrowing structures, while longer, were similar in height and width to a standard mobile home, and the structures were connected to utilities. This is very telling given that mobile homes may or may not be fixture depending upon the individual circumstances. *Millersport Bank Co. v. Blauser,* unreported, Case No. 37–CA–83, 1984 WL 4499 (Ohio App. 5th Dist.1984). Along this same line, the testimony presented at the Trial revealed that it is the regular practice of Telmark/Wells Fargo to exercise its right of repossession in situations involving similar structures.

Based, therefore, on the above objective considerations, in conjuncture with the express terms of Telmark's lease agreement, it is this Court's conclusion that the greater weight of the evidence supports a finding that no intent existed, as it applies to the test set forth by the Ohio Supreme Court in *Teaff,* to create a fixture. Similarly, the greater weight of the evidence, as will now be explained, also supports a finding that the structures constructed on the Debtors' property are not fixtures for purposes of the second element of the *Teaff* test.

The second element of the *Teaff* test looks to the chattel's adaptability and/or applicability to the use and purpose of the realty to which it is attached. *First Fed. S. & L. Ass'n. of Willoughby v. Smith,* 6 Ohio Misc. 68, 69, 216 N.E.2d 396 (1965). In the context of property used in the operation of a business, the Ohio Supreme Court, in *Zangerle v. Republic Steel Corp.,* addressed the issue of appropriation under the second element of the *Teaff v. Hewitt* test, holding, in paragraph seven of its syllabus:

> The general principle to be kept in view in determining whether what was once a chattel has become a fixture is the distinction between the business which is carried on in or upon the premises, and the premises. The former is personal in its nature, and articles that are merely accessory to the business, and have been put on the premises for this purpose, and not as accessions to the real estate, retain the personal character of the principal to which they belong and are subservient. But articles which have been annexed to the premises as accessory to it, whatever business may be carried on upon it, and not peculiarly for the benefit of a present business which may be of temporary duration, become subservient to the realty and acquire and retain its legal character.

144 Ohio St. 529, 530, 30 Ohio Op. 160, 60 N.E.2d 170 171–72 (1945). Based upon the application of this legal holding, the Court in *Zangerle v. Republic Steel Corp.,* found that steel processing machinery and equipment was personal property, rather than real property, stating, in paragraph eight of its syllabus, that, "[t]he business of manufacturing is a pursuit personal in its character and not strictly subservient to real estate or essential to the enjoyment of the freehold or inheritance in land." *Id.*

■ Thus, when business property is at issue, the essence of the second element of *Teaff* test is whether the chattel is specific to the type of business conducted on the realty? If so, then it will retain its character as personal property; this, as noted in *McGowan v. McGowan*, is what is commonly referred to as a "trade fixture." 18 N.E.2d 419, 420, 59 Ohio App. 397, 398 (1938). On the other hand, if the personalty is of the type that would generally be found on the realty, just the opposite is true, and the property (assuming, of course, that the other conditions of the *Teaff* test are met) may be deemed to be a fixture.

As for how this rule of law has been subsequently applied, a review of Ohio's case law shows that courts have looked primarily to the utility of the chattel with respect to a hypothetical purchaser (or even a simple occupier) of the underlying realty. For example, the following types of property have all been found to be particularly suited to the underlying business, and thus an accessory to the business rather than the underlying realty: kilns on concrete slabs, *Roseville Pottery*, 149 Ohio St. 89, 77 N.E.2d 608 (1948); an oxygen furnace used for the manufacture of steel, *Wheeling–Pittsburgh Steel Corp. v. Bd. of Revision*, 27 Ohio St.2d 45, 271 N.E.2d 861 (1971); a caging system for an egg production facility, *Pine Creek Farms v. Hershey Equipment*, Scioto App. No. 96–CA–2458, unreported, 1997 WL 392767 (July 7, 1997); a hydraulic boat lift that rests on the floor of a harbor channel, *Harbor Island Assn. v. Kaiser*, Ottawa App. No. 93OT022, unreported, 1994 WL 240289 (June 3, 1994), and a radio transmission tower, *Arcey Broadcasting, Inc. v. Limbach*, Stark App. No. CA–7578, unreported, 1989 WL 35039 (April 10, 1989).

By comparison, when an attached chattel may be more easily utilized by a subsequent buyer or occupier of the realty, courts are more apt to find that the chattel is a fixture based upon its improvement of the underlying realty. *Emch v. Lindley*, Sandusky App. No. S–85–6, 1985 WL 8199 (Oct. 18, 1985), drainage tubing installed on a parcel of real property was a fixture as it generally improved the land; *Matthew v. City Ice & Fuel Co.*, Gallia App. No. 81–CA–6, 1982 WL 3516 (Aug. 18, 1982), cistern and related water system, being necessary for any tangible use of the property, were fixtures; *G & L Investments v. Designer's Workshop, Inc.*, Lake App. No. 97–L–072, unreported, 1998 WL 553213 (June 26, 1998), heating system, although specifically selected for the needs of the business, was a fixture as any subsequent buyer would have been able to make equal utilization of the system.

As applied to this case, this Court is presented with a very close call. On the one side, the hog farrowing and gestations structures are unique to the Debtors' business of hog breeding. On the other hand, similar types of structures—i.e., storage structures for animals and/or equipment—are typically found on property utilized in the agricultural business.

■ On the whole, however, the latter statement has a clear weakness over the former. Specifically, the latter statement presumes that the Debtors' property would be utilized by a subsequent buyer for agricultural use, not in a residential or industrial capacity where the value of farrowing and gestation structures would be, at best, dubious. Although not an unreasonable assumption with many rural properties, such an assumption is too questionable in this case given the relatively small physical size of the Debtors' property—i.e., approximately three acres. (Plaintiff's Ex. No. 3). Thus, in following the principle that doubts should be resolved in favor of finding that an item of property retains its

characteristics as a chattel, this consideration, in this Court's judgment, tips the balance in favor of finding that the hog and farrowing structures do not, as is required to be a fixture under the second part of the *Teaff* test, conform to the typical use of structures utilized with that type of property. *Centennial Ins. Co. of New York v. Vic Tanny Int'l of Toledo, Inc.,* 46 Ohio App.2d 137, 143, 346 N.E.2d 330, 335 (1975).

 In summation, the Court is not persuaded that either the farrowing and/or gestation structures constructed on the Debtors' property have the attributes so as to meet either the second or third elements of the *Teaff* test. As such, these structures cannot be deemed to be fixtures for purposes of Ohio law. In turn, this means that since the hog farrowing and gestation structures are personal property, Pandora Bank's mortgage interests in the Debtors' realty do not attach to the structures. However, even assuming, for argumentative sake, that the farrowing and gestation structures did become fixtures, Pandora Bank's interest in the structures, as will now be explained, is not superior to that Wells Fargo, as assignee of Telmark's lease agreement with Jarvis Swine.

As previously set forth, the general rule under Ohio law is that an item of personalty that subsequently becomes a fixture, takes subject to any previously recorded mortgage covering the realty, even though the mortgaging instrument makes no reference to the fixture. Some exceptions, however, as Wells Fargo argued at the

conclusion of the Trial, exist to the applicability of this Rule. Of the possible exceptions, the Court finds persuasive Wells Fargo's position regarding the applicability of O.R.C. § 1310.37.

 Section 1310.37 of the Ohio Revised Code governs the effect of when leased goods become fixtures.[2] Relevant to this case is paragraph (D)(1) of this section, which provides, in relevant part:

> (D) The perfected interest of a lessor of fixtures has priority over a conflicting interest of an encumbrancer or owner of the real estate if ... the following applies:
>
> > (1) The lease is a purchase money lease, the conflicting interest of the encumbrancer or owner arises before the goods become fixtures, the interest of the lessor is perfected by a fixture filing before the goods become fixtures or within ten days after they become fixtures, and the lessee has an interest of record in the real estate or is in possession of the real estate.

Broken down, and stated in terms applicable to this particular case, the lessor of property that subsequently becomes a fixture will take priority over any preexisting interest in the underlying realty if, (1) the lease is a purchase money lease, (2) the mortgagee's interest arose before the goods became fixtures, (3) prior to the time the leased property becomes a fixture (or within 10 days thereafter), the lessor perfects its interest through a fixture fil-

---

2. For the record, it should be stated that, in the alternative, Wells Fargo argued for the applicability of O.R.C. § 1309.334 which governs the effect of security interests in fixtures. Pandora Bank, however, did not argue to the contrary and the weight of the evidence presented in this case shows that Wells Fargo's interest in the farrowing and gestation structures is in the nature of a true lease as op-

posed to a security interest in disguise. Of primary importance, Wells Fargo's lease agreement with the Debtors does not permit, at its expiration, the purchase of the farrowing and gestation structures for a nominal amount of consideration. *See, e.g., Brown Motors Leasing v. Reucher,* 80 Ohio App.3d 225, 229, 608 N.E.2d 1162 (1992).

ing, and (4) the lessee has an interest in or is in possession of the underlying realty.

Of these requirements, the first three do no present an issue: (1) Wells Fargo's lease with the Jarvis Swine, being at the basis of the financing for the construction of the farrowing and gestation structures, is a purchase money lease;[3] (2) Pandora Bank's mortgage interest, being in existence prior to the start of construction, arose before the time the farrowing and gestation structures became fixtures; and (3) as against the Debtors' real property, Telmark properly and timely recorded its lease interest in the farrowing and gestation buildings. The fourth requirement, however, is somewhat problematic given that the actual lessee of the farrowing and gestation structures is the limited liability company, Jarvis Swine, and not the Debtors in their personal capacity who both possess and are the record owners of the real estate. Nevertheless, under the circumstances as they exist here, this deficiency is not fatal.

 The purpose of the fourth requirement of O.R.C. § 1310.37 is straightforward: to ensure that notice of a lessor's interest in a fixture is imparted to potential third parties who may obtain a subsequent interest in the realty. As detailed in a well-know treatise on the Uniform Commercial Code:

> This requirement is designed to complement the rule that fixture filers mesh their claims with the real estate records so potential real estate interests can discover them. If the lessee has an interest of record, the fixture filing will be indexed so that persons interested in the real estate may obtain information about the existence of the fixture interest. If the lessee is in possession but not the owner, potentially interested third parties would be put on notice of claims by the lessee and through the lessee to the property by possession itself; moreover, . . . if the lessee does not have an interest of record, the record owner must be identified in the fixture filing.

*Hawkland Uniform Commercial Code Series*, William D. Hawkland, § 2A–309:04–Specialized Priority Rules.

In accordance with the notice function served by the fourth requirement of O.R.C. § 1310.37, the Court is convinced that any party inquiring into potential claims against the Debtors' realty would have been put on constructive notice of Telmark's (and later Wells Fargo's) interest in the farrowing and gestation structures situated on the realty. The basis for this conclusion is derived from the cumulative effect of these considerations: (1) Telmark's financing lease listed both the collateral and the realty upon which its collateral was located; (2) Jarvis Swine utilizes the same last name of the Debtors, Kenneth and Jeannine Jarvis; and (3) the UCC notice filed by Telmark, in addition to listing Jarvis Swine as a debtor, also listed both Kenneth and Jeannine Jarvis as codebtors. *See Hunter v. Key Bank Nat'l Assc. (In re Wisniewski)*, 265 B.R. 897 (Bankr.N.D.Ohio 2001) (discussing in length, the notice function of UCC financing statements).

Given, therefore, that the notice function of O.R.C. § 1310.37 has been fully served, to give legal effect to the distinction between Jarvis Swine, the limited liability company, and the Debtors, in their personal capacity, is to make a distinction where none really exists. As it regards this statement, it should be kept in mind that

---

**3.** Paragraph (3)(A) of O.R.C. § 1310.37, states that a "lease is a 'purchase money lease' unless the lessee has possession or use of the goods or the right to possession or use of the goods before the lease agreement is enforceable."

for all practicable purposes Jarvis Swine had no separate existence to that of the Debtors. By way of specific examples: (1) the Debtors cosigned and were guarantors for Jarvis Swine's obligation with Telmark; (2) besides the farrowing and gestation structures, Jarvis Swine had no other assets and was never adequately capitalized to operate the Debtors' hog raising business; (3) similarly, Jarvis Swine was never operated by the Debtors as a business entity; and (4) the Debtors' daughter, who was the only other person to have an interest in Jarvis Swine, never actively participated in any business operations conducted by the Debtors.

To summarize, it is this Court's judgment that the hog farrowing and gestation buildings constructed on the Debtors' real property are not fixtures for purposes of Ohio law. As such, Pandora Bank's lien interests in the Debtors' realty do not attach to these structures. In addition, even if the hog farrowing and gestation buildings are fixtures for purposes of Ohio law, O.R.C. § 1310.37 operates to confer upon Wells Fargo a superior interest in the buildings vis-a-vis Pandora Bank.

In reaching the conclusions found herein, the Court has considered all of the evidence, exhibits and arguments of counsel, regardless of whether or not they are specifically referred to in this Decision.

Accordingly, it is

**ORDERED** that the Complaint of the Plaintiffs/Debtors, Kenneth and Jeannine Jarvis, for Declaratory Judgment and for Violation of Stay, be, and is hereby, DISMISSED.

It is **FURTHER ORDERED** that both the Crossclaim and Third–Party Complaint filed by the Defendant, the First National Bank of Pandora, be, and are hereby, DISMISSED.

It is **FURTHER ORDERED** that Wells Fargo's lease with the Debtors shall, for purposes of any plan of reorganization put forth by the Debtors, be subject to the provisions of 11 U.S.C. § 365.